Carl Lanzisera,                   :

            Appellant       :

                      :

          v.             :

                      :

Northslope III Owners       :    No. 728 C.D. 2018

Association, Inc.           :    Submitted: March 14, 2019


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                HONORABLE ANNE E. COVEY, Judge (P.)
                HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                      FILED: April 2, 2019


        Carl Lanzisera (Lanzisera) appeals from the Monroe County Common Pleas Court's (trial court) November 21, 2017 order: (1) setting aside the Northslope III Owners Association, Inc. (Association) board of directors' (Board) action reducing the number of directors on the Board from nine to seven; (2) denying Lanzisera's request to be reinstated to the Board; (3) finding that the Board's August 2016 decision to proceed to contract to replace the siding on buildings 37-41 violated Section 5303(b) of the Uniform Planned Community Act's (UPCA)[1] (Section 5303(b)) notice requirements; and (4) voiding the Board's decision to encumber the Association's reserve account as collateral for a loan. Lanzisera presents three issues for this Court's review: (1) whether the trial court erred or abused its discretion by failing to determine that the Board breached its fiduciary duty to the Association when it found that the Board violated Sections 5303(b) and 5302(a)(17) of the UPCA (Section 5302(a)(17)); (2) whether the trial court erred or abused its discretion by

_____

[1] 68 Pa.C.S. § 5303(b).

failing to determine that the Board breached its fiduciary duty to the Association when the Board voted to proceed to contract to replace the siding on buildings 37-41; and (3) whether the trial court erred or abused its discretion by determining the issue of Lanzisera's request to be reinstated to the Board was moot.

**Facts**

Northslope III is a planned residential community located in Smithfield and Middle Smithfield Townships, comprised of 198 residential townhouse units contained in 39 wood-framed 2 and 3-story buildings. Lanzisera was appointed to the Board during the June 2015 annual meeting of the Association's members. The Board voted to reduce the number of directors from nine to seven members at the February 2015 Board meeting, before Lanzisera became a Board member. The Board's decision to reduce its complement was due to difficulty in obtaining quorums and because Board members' resignations often required the Board to work with fewer than nine directors.

Before 1993, 14 of the Northslope III buildings were constructed with exterior cedar clapboard siding. The remaining 25 buildings were built after 1999. These buildings have wooden T-111, wooden board and batten or vinyl exterior siding. In 2014, the Board replaced the cedar siding on buildings 37-41 with vinyl siding that was applied over the cedar siding. However, notwithstanding that no waterproof barrier was installed in the original buildings under the cedar clapboard, no new waterproof barrier was installed under the vinyl siding during the 2014 work on buildings 37-41. Further, the contractor did not finish the vinyl siding on buildings 40 and 41, and the vinyl siding that was installed on the other buildings was not installed properly.

The Falcon Group (Falcon), an engineering, architectural and energy-consulting firm, performed a Reserve Fund Analysis (RFA) for the Board in March

2

2015. It also inspected buildings 37-41 for siding defects (Inspection), leading to a report dated June 2015. The Board discussed Falcon's March 2015 RFA and the June 2015 Inspection at the June 27, 2015 annual Association's members' meeting. In particular, it was noted that Falcon found deficiencies in the siding installation, lack of weatherproofing under the siding and deteriorating cedar exterior siding which was left in place under the newly-installed vinyl siding. Falcon concluded that the buildings needed to have the existing siding completely removed, some support beams replaced, plywood installed, weatherproofing applied to the plywood and new exterior siding installed.

The Board held a meeting on July 25, 2015, wherein, the Board voted to obtain bids to fix and complete the inadequate siding work done on buildings 37-41. Lanzisera attended the Board meeting. The Board decided under new business that the Board would need to know by the following Monday which siding the Board will be selecting for scope of work/specs from Falcon. The Board chose Celect as the siding material for buildings 37-41 shortly after the July 25, 2015 meeting. Bids were solicited and reviewed. After the bids were received, the Board considered them too expensive. Falcon was directed to reduce the scope of the project. At the time this lawsuit was filed, on February 3, 2016, the Board had not decided whether to contract for the re-siding of buildings 37-41.

The Board voted to proceed with the project in August 2016 at a closed Board meeting. The Board did not give notice of its decision to re-side buildings 37-41 and its cost to the Association members. At the time the re-siding project started, the capital reserve fund contained $700,000. The total re-siding cost was $592,000. The Association entered into a loan agreement with Branch Banking and Trust Company (BBT) on November 8, 2016, in which it agreed to borrow $350,000 to pay for a portion of the siding project of buildings 37-41. The Board deposited $400,000 of the reserve account with BBT as collateral for the loan as of May 31, 2017. In the

event of default, the loan documents authorized BBT to seize the reserve fund. By May 31, 2017, the Board had spent $235,000 of the reserve fund on the re-siding project. The Board had not drawn any funds from the BBT loan as of May 31, 2017.

The Association operated at deficits of $65,468 in 2014, $52,997 in 2015 and $89,606 in 2016, totaling $208,071. The Falcon RFA showed that in March 2015 the cedar siding on buildings 69-72 needed to be replaced immediately with vinyl siding and the cedar siding on buildings 45-47 needed to be replaced with vinyl siding within one year. Buildings 37-41 were not scheduled for new vinyl siding for 34 years in that study. However, the Falcon Inspection had not yet occurred at that time. Lanzisera expressed concerns about the siding project at the January 16, 2016 Board meeting. A discussion followed with a full explanation of the siding project timeline. A motion was then made and passed to remove Lanzisera from the Board.

**Procedural background**

On February 3, 2016, Lanzisera filed a Petition for Review of Contested Corporate Action (Petition) in the trial court. On February 16, 2016, the Association filed preliminary objections to the Petition (Preliminary Objections). Lanzisera filed an answer thereto and New Matter on March 1, 2016. The Association filed an answer to the New Matter on March 14, 2016. On April 8, 2016, the trial court sustained the preliminary objection to Lanzisera's claim that he was wrongfully removed as a director on the grounds of lack of specificity as required by Pennsylvania Rule of Civil Procedure No. 1028(a)(3), and overruled the remaining objections. On April 28, 2016, Lanzisera filed an Amended Petition for Review of Contested Corporate Action (Amended Petition). The trial court scheduled a hearing for September 28, 2016. After many continuances, hearings were held on July 7, and May 31, 2017. On November 21, 2017, the trial court ordered:

1. The Board's action in reducing the number of directors of the corporation from nine to seven is set aside.

2. [] Lanzisera's request to be reinstated to the Board is denied.

3. The Board's decision in August, 2016 to proceed to contract to replace the siding on [b]uildings 37-41 without notice to the [Association's] members pursuant to [Section 5303(b)] violated the notice requirements of that statute.

4. The Board's decision to encumber the [Association's] reserve account as collateral for the BBT loan violated [Section 5302(a)(17)] and was void.

Trial Ct. Op. at 21-22.

Lanzisera filed post-trial motions on November 30, 2017.[2] On December 20, 2017, Lanzisera appealed to the Pennsylvania Superior Court. On December 26, 2017, the trial court issued an order directing Lanzisera to file a Pennsylvania Rule of Appellate Procedure 1925(b) statement of matters complained of on appeal (Rule 1925(b) Statement). Lanzisera filed his Rule 1925(b) Statement on December 28, 2017. On January 3, 2018, the trial court filed its Statement pursuant to Pennsylvania Rule of Appellate Procedure 1925(a) (1925(a) Statement) determining it would rely upon its November 21, 2017 opinion. By February 14, 2018 order, the Superior Court transferred the appeal to this Court.

Judgment was entered on April 12, 2018. Lanzisera appealed to this Court on May 1, 2018.[3] On May 2, 2018, the trial court entered another order

---

[2] The trial court did not rule on the post-trial motions within 120 days, thus they were denied by operation of law. *See* Pa.R.C.P. No. 227.4(1)(b).

[3]

> This Court's review of the trial court's decision is limited to determining whether the trial court committed an error of law or abused its discretion and whether its findings of fact are supported by the evidence. The interpretation of [a statute] is a question of law, subject to *de novo*, plenary review.

5

directing Lanzisera to file a Rule 1925(b) Statement. Lanzisera filed his Rule 1925(b) Statement on May 18, 2018. The trial court filed another 1925(a) Statement on June 7, 2018, stating it would rely upon its November 21, 2017 opinion.

**Discussion**

Lanzisera first argues that the trial court erred or abused its discretion by failing to determine that the Board breached its fiduciary duty to the Association when it found that the Board violated Sections 5303(b) and 5302(a)(17). Lanzisera relies upon *New Hope Academy Charter School v. School District of City of York*, 89 A.3d 731 (Pa. Cmwlth. 2014) (*New Hope*) to support his position. The Association rejoins that if the legislature intended for a UPCA violation to amount to an automatic finding of a breach of fiduciary duty, such a per se finding would have been provided for within the statute. In addition, the Association contends that the relief Lanzisera seeks has to be relief afforded under the Pennsylvania Nonprofit Corporation Law of 1988 (NPCL),[4] upon which Lanzisera filed his Amended Petition.

Initially, Section 5303(b) provides in relevant part:

> **The executive board shall deliver to all unit owners** . . . **notice of any capital expenditure approved by the executive board promptly after such approval**. . . . [T]he unit owners, by majority or any larger vote specified in the declaration, may reject any . . . capital expenditure approved by the executive board within 30 days after approval.

68 Pa.C.S. § 5303(b) (emphasis added). Section 5302(a)(17) states, in pertinent part, that an association may "[a]ssign its right to future income, including the right to receive common expense assessments[, but **r]eserve funds held for future major**

---

*A Pocono Country Place Prop. Owners Ass'n, Inc. v. Kowalski*, 186 A.3d 537, 541 n.1 (Pa. Cmwlth. 2018) (citation omitted).

[4] 15 Pa.C.S. §§ 5101–6160.

**repairs and replacements of the common elements may not be assigned or pledged**." 68 Pa.C.S. § 5302(a)(17) (emphasis added).

> The relevant facts in *New Hope* are as follows:
>
> New Hope's founder, Isiah Anderson, own[ed] three companies that d[id] substantial business with New Hope: Three Cord, Inc. (Three Cord), Three Cord Youth Services, LLC (TCYS), and I. Anderson Real Estate. Three Cord [was] a for-profit company solely owned by Anderson that was incorporated by him in February 2007. Three Cord manage[d] New Hope under written management agreements that require[d] New Hope to pay Three Cord 15% of its gross revenues and entitle[d] Three Cord to 50% of any unrestricted net income after expenses. TCYS operate[d] Challenge Academy, an Alternative Education for Disruptive Youth (AEDY) program in which New Hope place[d] disruptive students. Anderson Real Estate own[ed] the school building that New Hope use[d] and lease[d] it to New Hope.
>
> Anderson [was] not a member of New Hope's board of trustees and [was] not a salaried employee of New Hope. New Hope's charter, however, provided that [] Anderson [would] administer the school during the first few years of startup [sic]. New Hope listed Anderson as its principal officer and managing director in its 2008 and 2009 tax filings and listed Anderson as its Managing Officer on its letterhead as late as November 2010, and Anderson in 2011 and 2012 filed statements of financial interests stating that he was the Managing Officer of New Hope in 2010 and 2011.
>
> New Hope's board of trustees agreed to the management agreements, leases and contract with TCYS without discussion or consideration of their terms.

*Id.* at 734-35 (record citations and quotation marks omitted). The Charter School Appeal Board determined that New Hope violated Section 1103 of the Public Official

and Employee Ethics Act (Ethics Act),[5] and the NPCL in it contracts with its founder Anderson's businesses. New Hope appealed, *inter alia*, that determination.

This Court held that New Hope's "trustees failed to fulfill their duties to exercise reasonable skill and diligence in approving the[] contracts[]" **because New Hope's board of trustees did not discuss or consider the terms of the management agreements, leases, and contract with Anderson's businesses before approving them**. *Id.* at 741. Lanzisera asserts that the Board's Section 5303(b) notice requirement violation is analogous to New Hope's trustees' failure to discuss the terms of the management agreements, leases, and contract with Anderson's businesses before approving them.

However, the *New Hope* Court based its holding on Section 1103(f) of the Ethics Act, which mandates:

> No public official or public employee . . . or any business in which the person . . . is associated shall enter into any contract valued at $500 or more with the governmental body with which the public official or public employee is associated or any subcontract valued at $500 or more with any person who has been awarded a contract with the governmental body with which the public official or public employee is associated, **unless the contract has been awarded through an open and public process, including prior public notice and subsequent public disclosure of all proposals considered and contracts awarded**. In such a case, the public official or public employee shall not have any supervisory or overall responsibility for the implementation or administration of the contract. **Any contract or subcontract made in violation of this subsection shall be voidable by a court of competent jurisdiction if the suit is commenced within 90 days of the making of the contract or subcontract**.

65 Pa.C.S. § 1103(f) (emphasis added). Under the circumstances, there is no doubt that the trustees in *New Hope* violated the express terms of the Ethics Act and the

---

[5] 65 Pa.C.S. § 1103.

8

consequences stated therein applied. Accordingly, the Court held there was a fiduciary duty breach.

In contrast to the above facts and applicable law, the UPCA does not set forth a remedy much less mandate a conclusion that a violation is a per se fiduciary duty breach. This Court recognizes that Section 5412 of the UPCA provides that "[i]f a declarant or any other person subject to this subpart violates any provision of this subpart or any provisions of the declaration or bylaws, any person or class of persons adversely affected by the violation has a claim for appropriate relief." 68 Pa.C.S. § 5412. Here, while Lanzisera specifically requested relief under Section 5793 of the NPCL,[6] in this Commonwealth, Section 5303 of the UPCA governs the standard by which courts review an association's actions. *Burgoyne v. Pinecrest Cmty. Ass'n*, 924 A.2d 675, 683 (Pa. Super. 2007). Section 5303 of the UPCA provides, in relevant part:

> **Executive board members and officers**
>
> **(a)  Powers and fiduciary status.--**Except as provided in the declaration, in the bylaws, in subsection (b) or in other provisions of this subpart, the executive board may act in all instances on behalf of the association. In the performance of their duties, the officers and members of the executive board shall stand in a fiduciary relation to the association and shall perform their duties, including duties as members of any committee of the board upon which they may serve, in good faith; in a manner they reasonably believe to be in the best interests of the association; and with care, including reasonable inquiry, skill and diligence as a person of ordinary prudence would use under similar circumstances.

---

[6] Section 5793 of the NPCL states: "Upon application of any person aggrieved by any corporate action, the court may hear and determine the validity of the corporate action." 15 Pa.C.S. § 5793.

68 Pa.C.S. § 5303. Therefore, the issue before the trial court herein was whether the Board acted in good faith. *Burgoyne.*

> Relative to the Section 5303(b) notice provision, the trial court declared:
>
> > [T]he Board decided to proceed with the $592,000[.00] exterior siding contract, using or pledging almost its entire capital reserve account for the re-siding of [u]nits 37-41 at a [B]oard meeting closed to the members in August, 2016. The evidence reveals no notice of this decision, as a budget item or as a capital expenditure, to the members. **This lack of notice violated this provision of the UPCA**, which is a retroactive provision under [Section 5102(b.1) of the UPCA,] 68 Pa.C.S.[] § 5102(b.1), and which calls for full disclosure to members of such a decision.

Trial Ct. Op. at 15 (emphasis added; internal record citations omitted). Because the trial court ruled that the Section 5303(b) notice provision was violated, there was no need for the trial court to specifically opine that the Board violated its fiduciary duty to the Association. Accordingly, the trial court did not err or abuse its discretion by not finding that the notice violation was a breach of the Board's fiduciary duty to the Association.

> With respect to the Section 5302(a)(17) violation, the trial court concluded:
>
> > The Board was not permitted by the UPCA to agree to provide this collateral for the loan and **this action will be declared void**. At the time of the last hearing, **the Board had not drawn any money down on the loan** and was attempting to renegotiate its collateral for the loan with BBT.

Trial Ct. Op. at 16 (emphasis added). Because the trial court voided the action, and therefore it had no legal effect, there was no need for the trial court to specifically opine that the Board violated its fiduciary duty to the Association. Accordingly, this Court does not discern any error or abuse of discretion by the trial court for not expressly doing so.

Lanzisera next argues that the trial court erred or abused its discretion by failing to determine that the Board breached its fiduciary duty to the Association when the Board voted to proceed to contract to replace the siding on buildings 37-41. Specifically, Lanzisera contends that because the Board failed to consider the financial ramifications of same, and what was in the Association's best interest, it breached its duties of loyalty and care to the Association's members. The Association rejoins that the decision to proceed with the re-siding was a judgment call, which the Board had the authority to make. In addition, the Association asserts that courts are not permitted to substitute their judgment for that of a corporation's directors and will not interfere with a corporation's internal management unless the acts complained of constitute fraud, bad faith or gross mismanagement, or are unlawful or ultra vires.

At the outset, the Northslope III Declaration of Protective Covenants, Restrictions and Easements (Declaration) provides that the Association has an obligation to maintain the exterior structure of units in the community. Specifically, Article VII(A) of the Declaration provides in relevant part:

> COVENANTS FOR OWNERS ASSOCIATION ASSESSMENTS
>
> AND RIGHTS RELATING TO COLLECTIONS
>
> Common Expenses. The [] Association is authorized to contract for any goods and services as it deems necessary, and to pay expenses and other liabilities, out of the [c]ommon [f]und or reserves, if applicable, which costs for goods and services shall, without limiting the generality of the foregoing, include the following:
>
> . . . .
>
> (7) The cost of maintenance, repair and replacement of the [u]nit [e]xteriors and improvements in [c]ommon [a]reas as the . . . Association may deem necessary and proper, as well as any applicable materials, supplies, labor and services[.]

Reproduced Record (R.R.) at 296-297. The Declaration defines "[u]nit [e]xterior" as:

> The portions of a [u]nit needed to keep the [u]nit weathertight and attractive, including, the roof and roof structure; exterior walls; exterior painting, staining or siding; exterior windows; exterior doors, including any screen or storm doors; exterior ramps, steps, porches, decks, patios, terraces or balconies; parapets and copings; and fire escapes.

R.R. at 281. Article VIII(A) of the Declaration mandates:

> <u>Obligations of the Association</u>. The [] Association shall be responsible for the management and control of the [c]ommon [a]reas and shall keep the same in good, clean, attractive and sanitary condition, order and repair. The [] Association shall also be responsible for the oversight, administration and enforcement of certain obligations of the [o]wners relating to the [u]nit [e]xteriors and shall keep them in good condition. The [] Association shall be responsible for repairs and replacement of the roof, decks and steps; exterior painting; replacement of all exterior windows; repair and replacement of exterior doors and screen or storm doors.

R.R. at 301.

> [T]he wisdom or advisability of the [Board's decision to re-side buildings 37-41] is not an issue for a court to determine. In *McDonald v. Lake Hauto Club*, . . . 428 A.2d 785 ([Pa. Cmwlth.] 1981), [this Court] stated:
>
> > [I]t is [a] well[-]established legal principle that courts should not substitute their judgment for that of the directors of a corporation and will not interfere with the internal management of the corporation unless the acts complained of constitute fraud, bad faith or gross mismanagement or are unlawful or ultra vires.
>
> *Id.* at . . . 786 (citations omitted).

*Mulrine v. Pocono Highland Cmty. Ass'n, Inc.*, 616 A.2d 188, 190 (Pa. Cmwlth. 1992).

Here, Lansizera specifically contends that the Board voted to proceed with the re-siding of buildings 37-41 solely because three of the Board's members lived in those buildings, not because it was in the Association's best interests.[7] However, the record belies this contention.

Board member Doreen Dimonte (Dimonte) testified that she owns several units in Northslope III, but she resides in building 45.  *See* R.R. at 225.  When asked why the Board was looking into re-siding buildings 37-41, she explained:

> First, the company that was hired to install the vinyl siding never finished the project.  They basically -- essentially, it was a combination of them walking off the job, not finishing, and demanding more money, and the Association, members of the Board, deciding that we would go no further with them.[8]
>
> Two buildings were left unfinished, buildings 40 and 41.  They had nothing protecting them, very poor gutter system, and only partially sided throughout the winter of -- I believe it was '14 to '15.  Or '15 to '16.  I'm losing track of time.  I think it was '14 to '15.  So it was partly that.  It was unfinished.
>
> We needed to get something done to complete these buildings.  And then people were complaining about water seepage into their homes. . . .

R.R. at 228-229.  Dimonte related that the Board was unable to find a contractor who could repair the existing siding after the 2013 installation.  *See* R.R. at 229.  Dimonte

---

[7] Lanzisera also asserts that the Association's precarious financial position at the time the decision was made also evidences the Board's fiduciary duty breach to the Association.  However, the Association's poor financial state does not change the fact that the Declaration mandates the Board to keep the common areas including the unit exteriors in "good, . . . order and repair."  R.R. at 301.  Nor does it require a finding that any decisions made by the Board are a per se fiduciary duty breach.

[8] The Board voted to bring an action against the original contractors.  *See* R.R. at 233.

13

continued:

> Q. Did there come a point in time when the Board decided to engage in a study to determine what needed to be done to remedy the issues regarding [buildings] 37 through 41?
>
> A. Yes.
>
> Q. And is that the Falcon [Inspection]?
>
> A. That was the Falcon [Inspection]. Falcon . . . had done a [RFA] for us.[9] We were pleased with their work. We needed to find out – because we were getting different opinions from different [c]ontractors, that **we decided it would be much better for the Association to have an independent company, engineering company, look at what we were facing and give us an objective opinion**, not an opinion that would result in work provided to that person providing the opinion.

R.R. at 229 (emphasis added). Falcon visited Northslope III on June 5, 2015, and conducted a visual and invasive survey of the existing siding systems on buildings 37, 38, 39, 40 and 41. *See* R.R. at 432 (Falcon Inspection). Falcon concluded:

> The installation of the vinyl siding is problematic and has been installed over the original failing cedar and wood trim, which is not recommended. The original cedar siding was never properly installed over a weather resistive barrier or proper flashings. The installation of the vinyl siding over the old cedar siding will only hide these deficiencies and make future repairs more costly. When vinyl siding is fastened to the exterior of a building, it should be nailed to the framing members to insure a secure, permanent attachment that resists withdrawal. We also observed that the fasteners are nailed tight, which does not allow for the siding to move freely when it expands or contracts with changes in the air temperatures. This condition may cause the siding to bow or warp.

---

[9] Dimonte expounded: "The Falcon [RFA] was simply to look at all the components of the various buildings in the Association and to come up with a plan basically for maintenance and going into the future." R.R. at 230.

The lack of water resistive barrier under both the original cedar siding and the new vinyl siding is also problematic. This observed deficiency can lead to moisture infiltration behind the siding, which can then migrate to the wall sheathing and framing, which may lead to reported water leaks to the interior of a unit.

In addition, the siding itself has been poorly installed and deviates from industry standards. Siding should have a clearing of two (2'') inches where it meets a roof. Lack of proper clearance will lend distortion caused by the heat transferred from the asphalt shingles, and also to premature deterioration of wood components due to excessive moisture. Flashing around windows, doors and at dissimilar materials should be properly installed prior to installing the siding. Removal and replacement of rotted wood should have been performed prior to the installation of new vinyl siding; this is a primary reason why it is not recommended that vinyl siding is installed over cedar siding as it hides any wood deterioration or rotting.

**All these deficiencies appeared to be consistent throughout these five (5) buildings**. These conditions are of concern because they can all lead to water infiltration, and there is a possibility that the vinyl siding will start to become unfastened over time due to improper fastening methods.

R.R. at 444 (emphasis added). Falcon recommended

that the Association plan to remove and replace the vinyl siding. Based on our inspections, we would also recommend that the cedar siding should be removed in order to install plywood sheathing and provide proper flashing and a water resistive barrier between the framing and sheathing, and the exterior cladding [sic]. Existing wood rot and related damage should be addressed during the siding replacement.

R.R. at 444.

Further, Board President John J. Roman (Roman) testified that he owns a unit in building 38. *See* R.R. at 67-68. When asked if the Board decided to proceed with re-siding buildings 37-41 in good faith, Roman responded:

15

I think the Board approached this in a logical, systematic fashion in order to address a serious problem that was confronting this Board and the Association. They took it on the logical step-by-step manner, which took over a year, to arrive at this decision, which occurred in August of 2016. That is when the vote was actually taken to proceed.

R.R. at 257. Thus, the record evidences that the reason the Board chose buildings 37-41 for the re-siding was that all five buildings had improper siding installation and buildings 40 and 41 had incomplete siding installation. The Board could not find a contractor who believed the buildings could be repaired without being re-sided.

Based on the record evidence, the trial court concluded:

[T]he Board's actions were based upon recommendations from experts on how best to solve the siding issues on these buildings. The fact that other experts disagree[10] does not mean that the Board members acted improperly. There was no evidence of fraud, self-dealing or misuse of corporate funds. The Board's decision to re-side the buildings was a judgment call that the directors had the authority to make.

Trial Ct. Op. at 20. This Court discerns no error in the trial court's analysis. Accordingly, the trial court did not err or abuse its discretion by failing to determine that the Board breached its fiduciary duty to the Association when the Board voted to proceed to contract to replace the siding on buildings 37-41.

Lastly, Lanzisera argues that the trial court erred or abused its discretion by resolving that the issue of Lanzisera's request to be reinstated to the Board was moot. Specifically, Lanzisera contends that the trial court determined the issue was moot based on this Court's decision in *Lutz v. Tanglwood Lakes Community Ass'n, Inc.*, 866 A.2d 471 (Pa. Cmwlth. 2005), which in fact, ruled that the issue fell within an exception to the mootness doctrine.

---

[10] Lanzisera presented an expert who testified that he believed the siding on buildings 40 and 41 could be repaired. *See* R.R. at 156-161.

The Association rejoins that the *Lutz* Court did not hold that any time a director is removed for cause and the term has expired, the court must review whether the director's removal was proper. Rather, the Association maintains, the *Lutz* Court ruled that whether a board can remove a director for cause was a matter of great public importance that was capable of repetition and likely to evade review.

In *Lutz*, petitioner argued that the trial court erred in finding that the issue of whether he was properly removed by the board was moot because petitioner's term on the board of directors had expired. The *Lutz* Court explained:

> It is well settled that a court will dismiss an action as moot unless an actual case or controversy exists at all stages of the judicial or administrative process. Exceptions have been made to this principle when conduct complained of is capable of repetition yet likely to evade judicial review, when the case involves issues of great public importance or when one party will suffer a detriment in the absence of a court decision. We agree with [the petitioner] that the first two exceptions are applicable here.
>
> First and foremost, this case presents issues of great importance to the governance of Pennsylvania nonprofit corporations: Under what circumstances may a board of directors remove one of its members for proper cause? Must the bylaws of the organization specify what constitutes 'proper cause?' Such fundamental issues of nonprofit corporate governance are likely to reoccur. Second, given the typically short term of a directorship, in this case three years, a director removed at mid-term or later, or a director elected to less than a three-year term, would likely see his term expire before final resolution of any legal challenge to his removal. Because the issue raised by [the petitioner] is one of great public importance, which is capable of repetition yet likely to evade judicial review, we shall determine the propriety of his removal by the [b]oard.

*Lutz*, 866 A.2d at 473-74 (citations and footnote omitted). The Court concluded: "As a matter of law, we hold that Section 5726(b) of the [NPCL],[11] 15 Pa.C.S. § 5726(b), permits a board of directors to remove a director for proper cause irrespective of whether the organization's bylaws specify what constitutes 'proper cause.'" *Lutz*, 866 A.2d at 475.

"It is well settled that a court will dismiss an action as moot unless an actual case or controversy exists at all stages of the judicial or administrative process." *Id.* at 473. Because Lanzisera does not dispute that his term expired, the remedy of reinstatement is no longer available, thus, there is no meaningful relief to be ordered. Consequently, the issue of his removal is moot. Further, since the *Lutz* Court resolved the issue of whether a board of directors can remove a director under the NPCL irrespective of whether the organization's bylaws specify what constitutes proper cause, that issue is no longer "capable of repetition yet likely to evade judicial review[.]" *Id.* at 474.

Moreover, Lanzisera did not argue that his particular removal fell within an exception to the mootness doctrine.[12] Therefore, this Court cannot conclude that the issue of whether the Board removed Lanzisera for proper cause is "one of great

---

[11] Section 5726(b) of the NPCL provides:

> Unless otherwise provided in a bylaw adopted by the members, **the board of directors may declare vacant the office of a director who has been judicially declared of unsound mind or who has been convicted of an offense punishable by imprisonment for a term of more than one year, or for any other proper cause which the bylaws may specify**, or if, within 60 days, or other time as the bylaws may specify, after notice of selection, a director does not accept the office either in writing or by attending a meeting of the board of directors and fulfill the other requirements of qualification as the bylaws may specify.

15 Pa.C.S. § 5726 (emphasis added).

[12] The only argument relating to mootness that Lanzisera presented herein was since the *Lutz* Court determined that the issue therein fell within an exception to the mootness doctrine, the trial court should have ruled the same in this case. *See* Lanzisera Br. at 28.

18

public importance, which is capable of repetition yet likely to evade judicial review[.]" *Id.* at 474. Accordingly, the trial court properly ruled that the issue of Lanzisera's removal was moot.

For all of the above reasons, the trial court's order is affirmed.


_____
ANNE E. COVEY, Judge

19

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carl Lanzisera,                          :
         Appellant            :
                         :
            v.              :
                         :
Northslope III Owners              :     No. 728 C.D. 2018
Association, Inc.                          :

## O R D E R

AND NOW, this 2nd day of April, 2019, the Monroe County Common Pleas Court's November 21, 2017 order is affirmed.


_____
ANNE E. COVEY, Judge